UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WINCUP, INC.,

        Plaintiff,      :

  v.                                   Case No. 2:22-cv-02019
                                        Judge Sarah D. Morrison
                                        Magistrate Judge Chelsey M.
ACE AMERICAN INSURANCE         Vascura
COMPANY, *et al.*,                  :

        Defendants.

**OPINION AND ORDER**

      WinCup, Inc. brings this action against three of its insurance providers—HDI Global Insurance Company, ACE American Insurance Company, and Starr Surplus Lines Insurance Company—seeking indemnification for losses it incurred after a fire at one of its manufacturing facilities in Mount Sterling, Ohio. WinCup and two of the insurance providers (ACE and Starr, collectively "the Insurers") filed cross-motions for summary judgment (ECF Nos. 38, 39) on the proper interpretation of a deductible provision in the insurance policies. The motions are fully briefed and ripe for consideration.

      For the reasons below, the Court finds that the Time Element deductible provision outlined in the Insurers' policies is ambiguous. The extrinsic evidence resolves the ambiguity in favor of WinCup. However, WinCup has not provided the Court with sufficient information regarding the numerical inputs it used to

calculate its deductible, such that there remains a genuine issue of material fact as to whether WinCup properly calculated the deductible.

Accordingly, WinCup's Motion for Summary Judgment as to Phase I (ECF No. 38) is **GRANTED in part** and **DENIED in part**, and the Insurers' Motion for Partial Summary Judgment (ECF No. 39) is **DENIED**.

I.   FACTUAL BACKGROUND

   A.   WinCup's Business and Loss

WinCup manufactures disposable foam food service products, including cups, bowls, containers, straws, and lids. (WinCup Mot., ECF No. 38, PAGEID # 174; Hitchens Dep., Ex. 3, ECF No. 42-6, PAGEID # 1005.) The company operates several manufacturing facilities and structures its operations using an "interbranch system," by which certain facilities produce and supply lids to other facilities that then bundle the lids with foam products to sell to customers. (Hitchens Dep., ECF No. 42, 20:15–21:7; Starr Answer, ECF No. 14, PAGEID # 52; ACE Answer, ECF No. 16, PAGEID # 78.) The Mount Sterling facility only produces lids. (Hitchens Dep., 20:21-23; Starr Answer, PAGEID # 52; ACE Answer, PAGEID # 78.) It sells a small portion of these lids directly to customers, while the majority are shipped to other WinCup facilities through the interbranch system for bundling. (Hitchens Dep., 21:2-7; *see also id.*, 67:18-22 ("Their role is primarily to be a feeder plant of lids to other foam manufacturing facilities.").)

There was a fire at the Mount Sterling facility in October 2020, causing WinCup to suffer property damage, business interruption expenses, and other fees and expenses. (Insurers' Mot., ECF No. 39, Statement of Undisputed Facts

2

("Insurers' SOF") ¶ 1; Starr Answer, PAGEID # 53; ACE Answer, PAGEID # 79.) As to business interruption expenses, WinCup sustained lost profits for the lids that the Mount Sterling facility would have sold directly to customers, as well as lost profits for the lids that the Mount Sterling facility would have supplied to other WinCup facilities for sale with other products. (Hitchens Dep., 71:12-23.) Five other WinCup facilities (located in Illinois, Georgia, Arizona, Missouri, and New Jersey) were "affected to varying degrees by the fire." (Insurers' SOF ¶ 17.) WinCup's operations at these six facilities were interrupted for 61 days. (*Id.* ¶ 18.)

B. The Policies

WinCup had separate commercial property insurance policies with each of the Insurers.[1] (Insurers' SOF ¶ 2.) The relevant policies (collectively, "the Policies") covered the March 1, 2020, to March 1, 2021, policy year. (Insurers' Mot., Ex. 5 ("Starr Policy"), ECF No. 39-5, PAGEID # 328; *id.*, Ex. 6 ("ACE Policy"), ECF No. 39-6, PAGEID # 421.) The Policies insured WinCup against property damage and "Time Element" losses. (Insurers' SOF ¶ 13; *see also* Starr Policy, PAGEID # 330; ACE Policy, PAGEID # 423.) Time Element losses encompass "any and all loss[es] due to the interruption of [WinCup's] normal business operations, including, but not limited to, business interruption, extra expense, loss of rental income, and other similar economic losses[.]" (Starr Policy, PAGEID # 354; ACE Policy, PAGEID # 447.)

---

[1] The HDI policy has a fixed deductible and does not contain the at-issue deductible provision included in the ACE and Starr policies. (Hitchens Dep., 68:12-21.) As such, only the ACE and Starr policies are implicated in the parties' instant cross-motions.

The Policies each contain the same provision implementing a "5 X Average Daily Value (ADV)" deductible for Time Element losses. (Starr Policy, PAGEID # 330; ACE Policy, PAGEID # 423.) In other words, the deductible for business interruption coverage is not a fixed amount but rather is calculated by using a Time Element of the average daily value of production multiplied by five. The Policies state in relevant part:

> If a multiple of the Average Daily Value deductible is indicated for Time Element coverage, then the deductible amount shall be calculated as follows. With respect to any loss or expense for which the [Insurers] would be liable under the Time Element coverage(s), there shall first be deducted the amount obtained by multiplying the Average Daily Value for the affected location(s) at the time of such loss by the factor shown in the Declarations of the policy. The Average Daily Value will be determined by dividing the actual Gross Earnings less costs that would have been earned had no loss occurred by the actual number of working days, had no loss occurred, during the period of interruption, with due consideration being given to the experience of the business before the loss and the probable experience thereafter.

(Starr Policy, PAGEID # 368; ACE Policy, PAGEID # 461.)

C. **The Parties' Deductible Calculations**

The parties do not dispute that WinCup's losses are covered under the Policies, subject to the deductible provision. (WinCup Mot., PAGEID # 176; Insurers' Opp., ECF No. 43, PAGEID # 1113.) Where the parties diverge is how to calculate the deductible under the Policies.

On one side, to calculate the ADV for the period of business interruption following the fire, WinCup states that it first took "the gross earnings for all six affected WinCup locations for October and November 2020 and then multipl[ied] that total by a contribution percentage based on sales attributable to the Mt.

4

Sterling Facility during the relevant timeframe." (WinCup Mot., Ex. B ("Ardizzone Decl."), ECF No. 38-2, ¶ 5.) WinCup then divided the total contribution amount ($2,046,023) by 61 days—representing the number of days in the business interruption period—to reach an ADV of $33,541.36. (*Id.* ¶¶ 6–7.) Per the factor in the deductible provision, WinCup multiplied this ADV by five, resulting in a new total of $167,707. (*Id.* ¶ 7.) Finally, WinCup "multiplied the $167,707 total by a gross earnings percentage of 54.99%, representing WinCup's gross earnings, less costs, that would have been earned had no Loss occurred," yielding a Time Element deductible of $92,222. (*Id.* ¶¶ 8–9.)

On the other side, the Insurers calculated an ADV of $234,653. (Insurers' SOF ¶ 19.) Unlike WinCup, the Insurers did not factor in a "contribution percentage" or other "adjustment to account for the degree to which the other five WinCup facilities relied on lids from the Mount Sterling facility as a portion of sales." (Starr Answer, PAGEID # 60; ACE Answer, PAGEID # 86.) Rather, they took "the gross earnings, less costs, that would have been earned had no loss occurred during the period of interruption for all six affected WinCup locations insured under their policies and divid[ed] that amount by the 61 days during which WinCup's operations were interrupted." (Insurers' SOF ¶ 19.) The Insurers then multiplied this ADV by five to reach a Time Element deductible of $1,173,263—more than ten times larger than that calculated by WinCup. (Insurers' Opp., PAGEID # 1117; WinCup Mot., Ex. C ("Adjuster Letter"), ECF No. 38-3, PAGEID # 203.)

5

## II. PROCEDURAL HISTORY

WinCup filed suit against HDI, Starr, and ACE in June 2023. (Compl., ECF No. 1, *generally*.) The case was bifurcated into two phases: (1) determination of the proper deductible calculation ("Phase I"); and (2) determination of WinCup's recoverable damages under all three insurance policies ("Phase II"). (*See* ECF No. 29, PAGEID # 113.) The parties' instant cross-motions apply only to Phase I.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.

6

1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

The standards upon which a court evaluates motions for summary judgment "do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

## IV. ANALYSIS

According to WinCup, the ADV should be calculated using each affected facility's earnings *attributable only to* Mount Sterling lids. According to the Insurers, the ADV should be calculated using each affected facility's *total* earnings.[2]

### A. The deductible provision is ambiguous.

Under Ohio law,[3] an insurance contract is construed like any other written contract. *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006)

---

[2] The provision explicitly contemplates determination of the ADV "for the affected location(s)." (Starr Policy, PAGEID # 368; ACE Policy, PAGEID # 461.) Though the parties dispute the extent to which the other five facilities were impacted by the fire, they do not dispute that each facility was affected to some degree. (Insurers' Mot., PAGEID # 215 (citing Compl. ¶¶ 14–19).) Thus, the parties each correctly included all six WinCup facilities in their respective calculations.

[3] "Because this action is [before the Court] under diversity jurisdiction, state law governs the substantive issues." *Issuer Advisory Grp. LLC v. Tech. Consumer Prod., Inc.*, No. 5:14CV1705, 2015 WL 458113, at *3 (N.D. Ohio Feb. 3, 2015) (citation omitted); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938). In a diversity action, the forum state's choice-of-law rules determine which state's substantive law will apply. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). ACE and Starr maintain that Ohio law applies to this dispute,

7

(applying Ohio law). When interpreting a contract, the Court's role "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citation omitted). Courts presume that the parties' intent rests within the language of the contract. *Id.* "If the terms of a policy are clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning." *Scott*, 417 F. Supp. 2d at 933; *see also Allied World Surplus Lines Ins. Co. v. Richard Goettle, Inc.*, No. 20-3339, 2020 WL 8994338, at *2 (6th Cir. Nov. 5, 2020) (emphasis omitted) (quoting *Dealers Dairy Prods. Co. v. Royal Ins. Co.*, 164 N.E.2d 745, 747 (Ohio 1960)) ("An insurance contract … 'is to be given a reasonable construction in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed.'").

A contract will only require further analysis "if the applicable language is ambiguous—that is, open to more than one interpretation." *Scott*, 417 F. Supp. 2d at 932; *see also Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) ("Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."). "[T]he interpretation of written contract

---

and both they and WinCup cite to and rely upon Ohio law in their motions. Based on this, and because the parties have not argued that the substantive law of another state must be applied, this Court will apply Ohio law. *See Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (Rice, J.) (citation omitted).

8

terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law).

As noted above, the Time Element deductible provision provides:

> With respect to any loss or expense for which the Company would be liable under the Time Element coverage(s), there shall first be deducted the amount obtained by multiplying the Average Daily Value for the affected location(s) at the time of such loss by the factor shown in the Declarations of the policy. The Average Daily Value will be determined by dividing the actual Gross Earnings less costs that would have been earned had no loss occurred by the actual number of working days, had no loss occurred, during the period of interruption, with due consideration being given to the experience of the business before the loss and the probable experience thereafter.

(Starr Policy, PAGEID # 368; ACE Policy, PAGEID # 461.) The parties have proposed differing interpretations of what constitutes "the actual Gross Earnings less costs that would have been earned had no loss occurred" for computing the ADV. (*Id.*) Because the Court finds that both interpretations are reasonable, the language is ambiguous. *Covington*, 784 N.E.2d at 190.

### 1. WinCup's interpretation is reasonable.

WinCup advocates the use of contribution percentages to calculate the ADV. In its view, the ADV "will be determined by dividing the actual Gross Earnings less costs that *would have been earned had no loss occurred* by the actual number of working days, *had no loss occurred*, during the period of interruption, with *due consideration being given to the experience of the business before the loss and the probable experience thereafter*." (WinCup Mot., PAGEID # 183 (emphasis in original).) These phrases in the provision itself, WinCup reasons, "make clear that

9

the ADV should be calculated based on gross earnings forfeited *exclusively* to the Loss." (*Id.* (emphasis in original).) WinCup "gives effect to the policies by applying contribution percentages, which remove sales not impacted by the Mt. Sterling Facility fire from the ADV calculation." (WinCup Reply, ECF No. 45, PAGEID # 1132.)

WinCup's interpretation of the deductible provision is reasonable. The text refers to "actual Gross Earnings less costs that *would have been earned had no loss occurred*." (Starr Policy, PAGEID # 368 (emphasis added); ACE Policy, PAGEID # 461 (emphasis added).) The "loss" was the destruction resulting from the Mount Sterling fire. Had the fire not occurred, the facility would have continued to manufacture lids for direct-to-consumer sales and bundling at the other five facilities. However, because of the fire, the Mount Sterling facility did not realize any earnings from direct-to-consumer sales, and the other five facilities did not realize any earnings from bundling Mount Sterling lids with corresponding products. (Hitchens Dep., 71:12-23.) The Court agrees with WinCup that these unrealized values constitute what "would have been earned had no loss occurred" and thus are the only earnings that should be considered when calculating the ADV.

The Insurers correctly observe that "the words 'contribution percentage' appear nowhere in the Time Element Deductible provision or the ACE and Starr policies." (Insurers' Mot., PAGEID # 220.) Their argument that WinCup is improperly "rewrit[ing]" the provision by utilizing "a formula not supported by the

10

policy language," however, is unpersuasive. (Insurers' Opp., PAGEID # 1113, 1115.) Rather, WinCup's application of a contribution percentage *gives effect* to the words that *do* appear. "[A] contract must be construed … in a manner that does not leave any phrase meaningless or surplusage." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (citing *Local Mktg. Corp. v. Prudential Ins. Co.*, 824 N.E.2d 122, 125 (Ohio Ct. App. 2004)). By applying a contribution percentage, WinCup is giving meaning to the provision's call for earnings that "would have been earned had no loss occurred." WinCup's approach also gives meaning to the provision's mandate that the ADV "be determined … with due consideration being given to the experience of the business before the loss and the probable experience thereafter." This language addresses the concept inherent in business interruption insurance: estimates of what would have happened had there been no loss. Courts outside the Sixth Circuit find that these estimates "should be determined in a practical way, having regard for the nature of the business and the methods employed in its operation[.]" *Ross v. Travelers Indem. Co.*, 325 A.2d 768, 772 (Me. 1974). (*See also* Insurers' Reply, ECF No. 46, PAGEID # 1139 (citing *Ross* and other cases).) Considering the "nature" of WinCup's business and the "methods employed in its operation"—specifically, the interbranch system—WinCup's use of a contribution percentage gives due consideration to its experience and practical effect to the Policies.

    The objective of business interruption insurance further supports the reasonableness of WinCup's construction. "The purpose of business interruption

11

insurance is to do for the insured in event of a business interruption just what the business itself would have done if no interruption had occurred." *Suzuki of Cincinnati, Inc. Settles v. Grange Mut. Cas. Co*, No. 790787, 1981 WL 9596, at *8 (Ohio Ct. App. 1981) (citing *American Alliance Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 928 (6th Cir. 1957)). Put differently, business interruption insurance protects earnings that are lost or diminished *because of* a business interruption. Here, because of the fire, WinCup suffered losses amounting to what it would have made from selling the Mount Sterling lids and corresponding products. (Hitchens Dep., 71:12-23.) But its other products and sales not dependent on the lids were not impacted by the fire. Consistent with the goals of business interruption insurance, WinCup reasonably reads the provision as calling for the elimination of the earnings that would have been realized irrespective of the fire.

### 2. The Insurers' interpretation is also reasonable.

The Insurers' deductible figure accounts for each affected facility's total gross earnings encompassing all sales, regardless of whether the products constituted or contained a lid from Mount Sterling. (Insurers' Mot., PAGEID # 219.) They assert that this method is in accordance with the provision's plain language, which leaves no room for contribution percentages. (*Id.*, PAGEID # 220.)

The Insurers' approach is also reasonable. As acknowledged above, the deductible provision does not include the phrase "contribution percentage." (Insurers' Mot., PAGEID # 220.) It merely states that the ADV must be determined using the "actual Gross Earnings less costs that would have been earned had no loss

12

occurred."[4] Because the fire had no impact on sales of products not involving a Mount Sterling lid, WinCup would realize earnings from these products whether or not the fire occurred. These earnings could thus be considered those "that would have been earned had no loss occurred." It was reasonable, then, for the Insurers to account for these earnings in their ADV calculation along with the Mount Sterling-related earnings, which, added together, would equal the affected facilities' total earnings.

The language in the deductible provision requiring the ADV to "be determined … with due consideration being given to the experience of the business before the loss and the probable experience thereafter" does not invalidate the Insurers' use of total gross earnings. Courts interpret this phrase (which is common in business interruption insurance policies) as a caution against basing earnings estimates "solely on the accounting records of the insured, or on any other arbitrary accounting predilections." *Keleket X-Ray Corp.*, 248 F.2d at 929. Parties are to estimate earnings and losses "in a practical way" by considering the experience of the business, not by "being confined to the basis upon which books are kept for income tax purposes or for dealings with stockholders." *Id.* at 928–29. It is reasonable, then, to interpret this language not as supporting the use of a contribution percentage for a business like WinCup but rather as counseling the

---

[4] Although not raised by the parties, the Court observes that the phrase "actual Gross Earnings less costs that would have been earned had no loss occurred" is inherently ambiguous because it describes a value that is both definitively calculable ("actual" Gross Earnings) as well as estimated or approximate ("would have been earned"). Without more, the Court struggles to ascertain the meaning of this "actual-yet-hypothetical" value from the four corners of the Policies.

parties to be practical when evaluating WinCup's finances and accounts to calculate the deductible, either at an aggregate level or with respect to Mount Sterling only.

Because the deductible provision is subject to more than one reasonable interpretation, the Court concludes that it is ambiguous.[5]

### B. The extrinsic evidence and the contra proferentem canon resolve the ambiguity in favor of WinCup.

"[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citation omitted). Such extrinsic evidence may include "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (citation omitted). If extrinsic evidence cannot resolve an ambiguity and show the intent of the parties, "a court must apply the secondary rule of contract

---

[5] The parties devote large portions of their respective motions to analyzing or distinguishing two cases that also involve the interpretation of Time Element deductible provisions. (*See* WinCup Mot., PAGEID # 184 (citing *Texas Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007), and *Custom Aluminum Prod. Inc. v. Amerisure Ins. Co.*, No. 1:17 C 5785, 2018 WL 5977918, at *2 (N.D. Ill. Nov. 14, 2018)).) But those cases do little to assist the Court in deciding the correct interpretation of the specific deductible provision here. In *Texas Indus.*, while the court did find the provision unambiguous in its mandate to consider the loss in the context of the total premises (i.e., apply a contribution percentage), the policy there explicitly used the phrase "full percentage contribution" when outlining the calculation. 486 F.3d at 847. Similarly, in *Custom Aluminum*, the court found that the deductible limited the ADV calculation to the location suffering damage rather than all company locations—but there, only one location was affected. 2018 WL 5977918, at *8.

14

construction whereby the ambiguous language/special meaning is strictly construed against the drafter." *E. Liverpool v. Owners Ins. Co.*, 171 N.E.3d 1207, 1216 (Ohio Ct. App. 2021); *see also Westfield Ins. Co.*, 797 N.E.2d at 1262 (internal citations omitted) ("It is generally the role of the finder of fact to resolve ambiguity. However, where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. In the insurance context, the insurer customarily drafts the contract. Thus, an ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured.").

In this case, the extrinsic evidence is conclusive as to WinCup's intent but inconclusive as to the Insurers' intent. WinCup offers extrinsic evidence to support its interpretation of the provision, including deposition testimony from its corporate representative and corresponding exhibits, a declaration and materials from its damages consultant, and a letter from the Insurers' adjuster. (*See, e.g.*, WinCup Mot., Exs. 1–3.) Some of these sources are unhelpful in determining the parties' intent at the time the Policies were negotiated and executed—for instance, as the Insurers point out, WinCup's damages consultant was not involved in obtaining the Policies. (Insurers' Opp., PAGEID # 1110.) But the testimony from WinCup's representative, who was "heavily involved" in making the Policies, is sufficient. (Hitchens Dep. 6:5-17.) Ms. Hitchens testified that WinCup informed the Insurers of the interdependent nature of WinCup's business prior to the issuance of the

15

Policies.[6] (*Id.*, 45:3–46:7, 71:5-23.) She also testified that WinCup wanted the Policies to be made in such a way as to account for this interdependent nature, particularly with respect to Mount Sterling. (*Id.*, 72:3-20.) Finally, Ms. Hitchens described WinCup's conduct of updating and submitting business interruption worksheets to the Insurers containing costs and values specifically revised to account for the Mount Sterling interbranching operations, which WinCup discussed with the Insurers' representative at a meeting in early 2020. (*Id.*, 20:9–21:13, 39:5–40:25, 47:17-25; *see also id.*, Exs. 5, 10 (worksheets).) WinCup's premium increased because of these changes. (*Id.*, 60:22–63:2, 70:18–71:4.)[7]

The Insurers do not controvert this testimony, nor do they direct the Court to any extrinsic evidence showing WinCup intended the language to have the meaning the Insurers advance. The Insurers highlight that WinCup agreed to the Time Element deductible because it could not obtain a fixed deductible. (Insurers SOF ¶¶12–13.) The Insurers also provide deposition testimony from a representative of WinCup's insurance broker, who did not recall whether there were any discussions about the deductible provision between the parties. (*Id.* ¶ 16; Insurers' Mot., Ex. 3,

---

[6] It is unclear whether WinCup conveyed its intent as to the deductible provision specifically—as opposed to its intent regarding the general nature of its business—to the Insurers. *See G.F. Bus. Equip., Inc. v. Liston*, 454 N.E.2d 1358, 1361 (Ohio Ct. App. 1982) ("The uncommunicated subjective intentions of one party have no significance in determining the meaning of disputed terms.").

[7] Though inappropriate to consider in determining the parties' intent at the time of contracting, the fact that the parties revised the deductible language within the Policies for the policy year following the fire to explicitly apply WinCup's interpretation lends further support to the Court's conclusions. (Hitchens Dep., Ex. 12, ECF No. 42-15, PAGEID # 1108.) *See, e.g., Leisure v. State Farm Mut. Auto. Ins. Co.*, No. 2001CA00095, 2001 WL 1487920, at *1–2 (Ohio Ct. App. 2001).

16

30:10–31:19, 42:8-15.) But this evidence fails to show any affirmative intent on WinCup's part, unlike the testimony of WinCup's own representative.

There is no extrinsic evidence showing how the Insurers intended the deductible provision to function. When a court rules on a motion for summary judgment, the movant has the burden of establishing there are no genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 322–23. The Insurers failed to carry their burden to demonstrate their intent, and the extrinsic evidence that *was* offered supports WinCup's intent and interpretation.

The Court notes that even if an ambiguity still existed, the Court would interpret such ambiguity against the Insurers and in favor of WinCup. *See Westfield Ins. Co.*, 797 N.E.2d at 1262; *see also GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999) (citation omitted) (observing that the rule of construction that ambiguities are to be construed against the drafter is "something of a fallback canon").

### C. A genuine issue of material fact exists as to the amount of the deductible.

Both WinCup and the Insurers separately ask the Court to hold that they, as opposed to the other, "properly calculated" the "correct" deductible." (*See, e.g.*, WinCup Mot., PAGEID # 180; Insurers' Mot., PAGEID # 220.) After reviewing the materials, the Court is not clear how either side computed their deductible figure. Because the Court has concluded that the provision is ambiguous and has construed it in favor of WinCup's interpretation, the Insurers' calculations are no longer at issue.

WinCup contends that the Time Element deductible should be $92,222. A chart provided by WinCup's damages consultant details the path WinCup took:

**Win Cup Inc.**
Mount Sterling, OH
Date of Loss 10.07.20
**Contribution Percentage For Calculation of ADV**
*Preliminary Claim Subject to Discussion*

| Plant | Percentage of Sales From Mount Sterling | Plant sales for October 2020 | Plant sales for November 2020 | Total | Contribution Percentage | Contribution Amount |
|---|---|---|---|---|---|---|
| West Chicago | 1.40% | $ 3,690,265 | $ 2,637,072 | $ 6,327,337 | 1.40% | $ 88,583 |
| Stone Mountain | 12.80% | 3,501,256 | 2,854,109 | 6,355,365 | 12.80% | 813,487 |
| Tolleson Az | 4.10% | 3,463,252 | 2,692,598 | 6,155,850 | 4.10% | 252,390 |
| Mount Sterling, OH | 100.00% | 245,381 | 162,895 | 408,276 | 100.00% | 408,277 |
| Higinsville Mo. | 9.10% | 1,180,414 | 950,777 | 2,131,191 | 9.10% | 193,938 |
| Metuchen NJ | 9.60% | 1,721,436 | 1,292,609 | 3,014,045 | 9.60% | 289,348 |
| Total | | $ 13,556,623 | $ 10,427,165 | $ 24,392,064 | | $ 2,046,023 |

| | |
|---|---|
| Net Sales Values for Period of Interruption | $ 2,046,023 |
| Days in Period | 61 |
| ADV | 33,541.36 |
| Days in deductible | 5 |
| 5 day deductible of Net Sales | $ 167,707 |

(WinCup Mot., Ex. B, DECL-1, ECF No. 41-2, PAGEID # 605.) As a final step not depicted on the chart, WinCup multiplied the $167,707 total by "a gross earnings percentage of 54.99%" to reach a $92,222 deductible. (Ardizzone Decl. ¶¶ 8–9.)

Initially, contrary to WinCup's explanation, it appears that WinCup did not start with "the gross *earnings* for all six affected locations for October and November 2020" but rather the gross *sales*. (Ardizzone Decl. ¶ 5.) This is confirmed by the columns in the chart that read "Percentage of *Sales* From Mount Sterling," "Plant *Sales* for October 2020" and "Plant *Sales* for November 2020," as well as the

18

phrase "Net *Sales* Values for Period of Interruption." (WinCup Mot., Ex. B, DECL-1, PAGEID # 605 (emphasis added).) But the deductible provision explicitly requires the ADV to be identified using "the actual *Gross Earnings* less costs that would have been earned had no loss occurred." (Starr Policy, PAGEID # 368 (emphasis added); ACE Policy, PAGEID # 461 (emphasis added).) WinCup's sales are unlikely to be equivalent to its Gross Earnings (which is a defined term in the Policies). The Court assumes that WinCup's use of "a gross earnings percentage of 54.99%" is meant to remove certain values and arrive at Gross Earnings, but nowhere does WinCup confirm this assumption or clearly explain the purpose, origin, or accuracy of the 54.99%.

Also uncertain is the nature of the values listed in the chart. The Court cannot discern whether these numbers represent WinCup's *actual sales* for October and November 2020 (after the occurrence of the fire), or its *estimated sales* for October and November 2020 (assuming the fire did not occur), or some other metric entirely. The Court suspects that the exhibit to WinCup's damages consultant's declaration may answer this and other questions, but WinCup chose to file only a redacted version of the declaration, in which the pertinent revenue estimates and other figures are blacked-out. (*See* WinCup Mot., Ex. B, DECL-1, PAGEID # 607–08.) Knowing these values is crucial to the deductible calculation because, as explained above, computation of the ADV requires gross earnings had the loss *not* occurred, not gross earnings had the loss occurred. As a result, the Court cannot

19

conclude from WinCup's materials that the company used the correct value as its "Gross Earnings less costs that would have been earned had no loss occurred."

"The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other … Rather, the court must evaluate each party's motion on its own merits[.]" *Taft Broad. Co.*, 929 F.2d at 248 (citation omitted). Here, WinCup has not carried its burden to establish that there are no genuine issues of material fact as to its computation of the deductible amount.

## VI. CONCLUSION

For the reasons articulated above, WinCup's Motion for Summary Judgment as to Phase I (ECF No. 38) is **GRANTED** as to its interpretation of the deductible provision and **DENIED** as to the correctness of its calculations. The Insurers' Motion for Partial Summary Judgment (ECF No. 39) is **DENIED** in full.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**