**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

WINCUP, INC.,

                  **Plaintiff,**        :

     **v.**                        **Case No. 2:22-cv-2019
                                   Chief Judge Sarah D. Morrison
                                   Magistrate Judge Chelsey M.
                                   Vascura**

ACE AMERICAN INSURANCE
COMPANY, *et al*.,            :

                  **Defendants.**

## OPINION AND ORDER

WinCup, Inc. filed suit against HDI Global Insurance Company, ACE American Insurance Company, and Starr Surplus Lines Insurance Company (the "Insurers") after they denied WinCup's claim for losses caused by a fire at its Mount Sterling, Ohio manufacturing facility. WinCup filed a breach of contract claim against all three Insurers, and sought declaratory judgment against ACE and Starr. The parties agreed to bifurcate the case, with Phase I limited to interpreting certain deductible provisions and Phase II focused on determining WinCup's "recoverable damages." The parties now move for summary judgment on Phase II. (Pl.'s Mot., ECF No. 60 (redacted), ECF No. 61 (sealed); Defs.' Mot., ECF No. 66.) The Insurers also move to bar expert testimony offered in support of WinCup's motion. (Mot. Bar, ECF No. 62.) For the reasons below, the Insurers' motion to bar testimony is **GRANTED in part** and **DENIED in part**, and the motions for summary judgment are **DENIED**.

## I.  FACTUAL BACKGROUND

The facts underlying this case are not in dispute. WinCup manufactures disposable food-service products, including cups, lids, and straws. The company operates several manufacturing facilities and uses an "interbranch" system by which certain facilities produce and supply lids to other facilities that then bundle the lids with cups and straws for sale. The Mount Sterling facility only produces lids. It sells a small portion of these lids directly to customers, while the majority are shipped to other WinCup facilities for bundling.

On October 6, 2020, an electrical fire at the Mount Sterling facility temporarily halted production. As a result, Mount Sterling was unable to fill direct orders and unable to provide its sister facilities with lids for bundling. WinCup tried to make up the loss by ramping up lid production at its West Chicago, Illinois facility and by purchasing lids from third parties. Despite those efforts, some orders went unfilled and many were filled late. WinCup retained AVEO International Corporation and its principal, Glenn Ardizzone, MS, CPA, CFF, CGMA, to prepare a loss valuation for its claim under the business interruption and extra expense coverages written by the Insurers (the "Policies").

The three Policies[1] have different deductible provisions: The HDI Policy has a $250,000 deductible, while the Starr and ACE Policies each have a variable time-

---

[1] The ACE Policy appears in the record at ECF No. 39-6, the Starr Policy appears at ECF No. 39-5, and the HDI Policy appears at ECF No. 62-1.

element deductible. Nevertheless, the Policies have identical terms for business interruption and extra expense coverage.

As to business interruption, the Policies cover "loss directly resulting from the necessary interruption of business incurred by the Insured during the Period of Interruption." (Policies, Endorsement No. 8.) The covered loss is measured as "the reduction in Gross Earnings, less charges and expenses that do not necessarily continue during such Period of Interruption," as those terms are defined in the Policies, and with "due consideration to the experience of the business." (*Id.*) "Gross Earnings" means the sum of:

  a.  total net sales value of production (manufacturing operations), and

  b.  total net sales of merchandise (mercantile operations), and

  c.  other earnings derived from operations of the business, less [certain enumerated costs.]

(*Id.*) As to extra expense, the Policies cover "reasonable and necessary extra expenses incurred to temporarily continue as nearly normal as practical the conduct of" the business during a "Period of Restoration." (*Id.*, Endorsement No. 18.) Lost income is not considered an extra expense. (*Id.*)

Based on AVEO's calculations, WinCup claims that its business interruption and extra expense loss totaled $1,938,741.[2] But the Insurers calculate WinCup's loss at only $441,416. WinCup initiated this action to resolve the dispute.

---

[2] These figures exclude WinCup's property damage claim, which is not relevant to the issues now before the Court.

3

## II.     PROCEDURAL HISTORY

WinCup asserted a breach of contract claim against the Insurers for "failing to pay WinCup for all damages resulting from the Loss in accordance with" the Policies, and sought declaratory judgment against ACE and Starr as to the "rights and duties of the parties under the ACE and Starr Policies with respect to the" time-element deductible. (Compl., ECF No. 1.)

The parties agreed to bifurcate discovery and dispositive motions: Phase I would decide how the time-element deductible should be calculated under the ACE and Starr Policies and Phase II would address WinCup's claim for damages under all three Policies. The parties filed cross-motions for summary judgment on Phase I, each advocating that the time-element deductible should be calculated according to their interpretation of the Policy language. This Court concluded in a March 2024 Opinion and Order that the Policy language was subject to more than one reasonable interpretation, but that all extrinsic evidence supported WinCup's calculation methodology. (March 2024 Opinion, ECF No. 47.) The Court was unable to conclude as a matter of law, however, whether WinCup's figures were accurate. So, while the Court determined <u>how</u> to calculate the deductible, that calculation remains to be done. The parties now move for summary judgment on Phase II.

For efficiency, the Court will first address WinCup's Motion for Summary Judgment and the Insurers' Motion to Bar before moving on to the Insurers' Motion for Summary Judgment.

4

### III.   WINCUP'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

WinCup's Motion for Summary Judgment seeks damages under the Policies, but is not framed around the elements of a breach of contract. Instead, WinCup

asserts entitlement to judgment as a matter of law by arguing that Mr. Ardizzone produced a report that correctly interprets the Policy language or, in the alternative, reasonably interprets ambiguous Policy language.

Under Ohio[3] law, an insurance policy is construed like any other written contract. *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006). "If the terms of a policy are clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning." *Id.* at 933; *see also Allied World Surplus Lines Ins. Co. v. Richard Goettle, Inc.*, No. 20-3339, 2020 WL 8994338, at *2 (6th Cir. Nov. 5, 2020). A contract will only require further analysis "if the applicable language is ambiguous—that is, open to more than one interpretation." *Scott*, 417 F. Supp. 2d at 932. "[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law).

WinCup argues that Mr. Ardizzone's interpretation of "reduction in Gross Earnings" is correct because it "gives full meaning" to the Policy language by "focusing on lost operational sales" instead of lost production. (Pl.'s Mot., 8–9.) By the same token, WinCup lambasts the Insurers' accounting expert for calculating

---

[3] This case is before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332. "[F]ederal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, *inter alia, Erie R. Co. v. Tompkins*, 304 U.S. 64 (1939)). Both parties cite Ohio law and no party argues for application of any other state's laws. Accordingly, the Court applies Ohio law in its analysis.

Gross Earnings "by applying a net selling price" to the production capacity lost as a direct result of the fire. (*Id.*)

WinCup's arguments are untethered to the Policy language and are, thus, fatally flawed. "Gross Earnings" means the sum of:

    a.   **total net sales value of production (manufacturing operations)**, and

    b.   total net sales of merchandise (mercantile operations), and

    c.   other earnings derived from operations of the business, less [certain enumerated costs.]

(Policies, Endorsement No. 8 (emphasis added).) It is undisputed that the fire occurred at one of WinCup's manufacturing facilities. As a result, the Policies— plainly and unambiguously—require the calculation to begin precisely where WinCup says it should not: the value of lost production. Mr. Ardizzone thus failed to calculate WinCup's losses in a manner that conforms to the Policy language.

WinCup's Motion for Summary Judgment is **DENIED**.

## IV.    MOTION TO BAR THE TESTIMONY OF GLENN ARDIZZONE

Instead of challenging Mr. Ardizzone's failure to calculate WinCup's losses using the method set out in the Policy language, the Insurers move to "bar" his testimony for failure to satisfy Federal Rule of Evidence 702.

Rule 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee's notes to 2000 and 2011 amendments. In accordance with that instruction, this Court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The proponent of the expert testimony bears the burden of proving its admissibility. *See* Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

The Court is afforded "considerable leeway" both in determining whether to admit expert opinion testimony and how to test its reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. Even if the Court determines that expert testimony is relevant, it may nevertheless be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at

8

595 (quoting Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound;</u> <u>It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991)).

WinCup offers Mr. Ardizzone as an expert in calculating commercial property insurance claims. (*See* Ardizzone Rep., PAGEID # 1268.) In his expert report, Mr. Ardizzone opines on the amount of WinCup's property damage, business interruption, and extra expense losses incurred as a result of the fire and, thus, covered under the Policies. (*See id.*, generally.) Before advancing his calculations, Mr. Ardizzone recites background on WinCup, the fire, and his method of calculating the covered losses. (*Id.*)

The Insurers do not challenge Mr. Ardizzone's qualifications as an accounting expert. Nor do they challenge the relevance of those calculations to the case. But, in view of the Court's ruling, *supra*, that his calculation methodology fails to follow the Policy terms, the Court finds that the calculations set out in Mr. Ardizzone's expert report are irrelevant—that is, they would not <u>assist</u> the jury. If anything, those calculations would <u>confuse</u> the jury. That alone is sufficient reason to preclude Mr. Ardizzone from testifying as an expert.

The Insurers focus their argument on the reliability of Mr Ardizzone's principles and methodology. (*See* Mot. Bar, *generally*.) In particular, WinCup takes issue with Mr. Ardizzone's estimation of lost Gross Earnings.[4] (*Id.*)

---

[4] The Insurers also argue that Mr. Ardizzone failed to verify the accuracy of data provided to him by WinCup's executives. Although an expert's opinion may be excluded when he "merely offers his client's opinion as his own," *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014), the Rules allow an expert to base an opinion on facts that he has not personally observed. Fed. R. Evid. 703. To the extent there is any weakness in the factual basis of an expert's

To estimate Gross Earnings had the fire not occurred, Mr. Ardizzone's calculation assumes "that the sales in October and November of 2020 would have been the same as 2019[.]" (Ardizzone Dep., 65:7–9.) In deposition, he justified his departure from an ordinary statistics-based trendline by pointing to the COVID-19 pandemic. Mr. Ardizzone testified that COVID caused WinCup's early 2020 sales to decrease so severely that it was "difficult" to use a traditional 24-month trendline to forecast sales. (*Id.*, 64:19–24, 82:20–21.) He then testified that WinCup's sales figures from August–September 2020 (the two months preceding the fire) were down 4.6% from the same period in 2019. (*Id.*, 99:19–100:8.) Yet, Mr. Ardizzone defended his conclusion that 2020 sales "would have been the same as 2019" (even calling it a "conservative" assumption) because COVID resulted in an "increased demand" for take-out food containers like WinCup's. (*Id.*, 65:6–10, 84:10–13.) When asked what analysis he performed to support his conclusion that COVID resulted in high demand for WinCup products, Mr. Ardizzone said:

---

opinion, it generally bears on the weight of the opinion testimony, rather than its admissibility. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530–31 (6th Cir. 2008).

    More concerning (though the Insurers do not mention it) is Mr. Ardizzone's failure to verify his proposed Period of Interruption. He used a 61-day Period of Interruption encompassing all of October and November 2020. (Ardizzone Rep., PAGEID # 1286.) Given that the fire occurred on or about October 6, Mr. Ardizzone's Period of Interruption is not accurate. "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *see also Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony. . . is inadmissible when the facts upon which the expert bases his testimony contradict the evidence.").

10

> Yes, I had Googled it multiple times, but I couldn't come up with an exact percentage to be able to put into the report. I looked for methodology to say that in disposable takeout containers they would have been up 25, 35, 50 percent, but I wasn't able to get information that I was able to put into the report to give to the insurance company.

(*Id.*, 64:9–65:22.) It should go without saying, "Googling it" is not a reliable or expert method for identifying sales forecasting trendlines. Mr. Ardizzone's deposition testimony demonstrates a failure to reliably apply reliable methods to the facts of the case. It would thus be inconsistent with Rule 702 for WinCup to present Mr. Ardizzone's calculations to a jury with the imprimatur of expertise.

Nevertheless, Mr. Ardizzone may be able to testify as a fact witness. He was retained shortly after the fire to develop WinCup's claim. So, though Mr. Ardizzone will not be permitted to testify as an expert witness, his testimony will not be "barred," to use the Insurers' words.

The Insurers' Motion is thus **GRANTED** to the extent Mr. Ardizzone is offered as an expert witness and **DENIED** to the extent he may be a fact witness.

## V.    INSURERS' MOTION FOR SUMMARY JUDGMENT

The Insurers move for summary judgment on the grounds that, without Mr. Ardizzone, WinCup is unable to establish that its covered losses exceed the Policies' deductibles (*i.e.*, that the Insurers' alleged breach caused WinCup to suffer damages). *See Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (explaining that an Ohio breach of contract claim requires, *inter alia*, that the plaintiff was damaged by the defendant's breach). But the Insurers themselves acknowledge that, if the Court does not bar Mr. Ardizzone's testimony (which it

does not), it must deny their Motion for Summary Judgment (Defs.' Mot., PAGEID # 1933). The Insurers' Motion for Summary Judgment is thus **DENIED**.

## VI.     CONCLUSION

For these reasons, the Insurers' Motion to Bar Testimony of Glenn Ardizzone is **GRANTED in part** and **DENIED in part**, and the parties' Motions for Summary Judgment are **DENIED**. This matter will be set for a jury trial by separate order.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**